
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Deember 6, 2016 Session

## AARON MALONE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 08-02332     James C. Beasley, Jr., Judge**

_____

### No. W2016-00666-CCA-R3-PC

_____

The petitioner, Aaron Malone, appeals the denial of his petition for post-conviction relief from his conviction for first degree felony murder. He asserts that the court erred in denying relief because he received the ineffective assistance of counsel and his due process rights were violated by the State's failing to preserve unedited footage from "The First 48" television show. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT L. HOLLOWAY, JR., JJ., joined.

Lance R. Chism (on appeal) and TeShaun D. Moore (at hearing), Memphis, Tennessee, for the appellant, Aaron Malone.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Kenya N. Smith and Karen Cook, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The petitioner was indicted along with a co-defendant, Calvin Nelson, for first degree felony murder committed during an attempted robbery. The petitioner filed two motions to suppress prior to trial, both of which were denied by the trial court, and the case proceeded to trial. The jury convicted the petitioner as charged, and the trial court imposed a sentence of life imprisonment as a violent offender. The petitioner appealed, challenging the trial court's rulings on his motion to suppress his statement, the

admission of the victim's teeth at trial, and the State's use of an expert witness in rebuttal. This court affirmed the trial court's judgment, and the Tennessee Supreme Court denied the petitioner's application for permission to appeal. State v. Aaron Malone, No. W2009-02047-CCA-R3-CD, 2011 WL 1005487, at *1 (Tenn. Crim. App. Mar. 22, 2011), perm. app. denied (Tenn. July 13, 2011).

The underlying facts of the case were recited by this court on direct appeal as follows:

> The parties presented the following evidence at the [petitioner's] July 2009 trial. Joseph Zeller testified that he owned Tiger Truck Lines and that the victim began working for the truck line six to seven years before the trial. Mr. Zeller stated that the victim was in Memphis, Tennessee, between September 16 and September 17, 2007, because he was delivering a load of appliances to a warehouse. Mr. Zeller identified a picture of the victim's truck outside of a warehouse in Memphis, and he said that he was familiar with the truck because he bought it from the victim's widow after his death. He testified that a person standing on the ground would not be able to look into the truck's window, which was six and a half to seven feet off the ground. Mr. Zeller identified two Comcheck cards, which had "Tiger Truck Lines, New Albany, Indiana" on the front. He said that he knew the victim used those two cards because the card numbers matched the bill associated with the victim's truck and because the victim signed the receipts.

> Ricky Cole testified that on September 17, 2007, he was working at Serpro, a warehouse located at 3835 Knight Road in Memphis, Tennessee. He said that he saw a truck parked at the warehouse that he recognized as belonging to a truck driver that regularly delivered to Serpro. Someone informed him that the truck had a broken window, so he went to investigate. He testified that he knocked on the door, and when no one answered, he opened the door and discovered the victim's body lying in the aisle of the truck. Mr. Cole said that he did not notice anything unusual about the truck other than the broken glass and did not notice signs of blood. He testified that he called 911 immediately after finding the victim.

> Memphis Police Officer Shaun Tucker testified that he responded to a homicide call on September 17, 2007. He said that he secured the scene and located witnesses. Officer Tucker maintained the scene until his lieutenant, the homicide bureau investigators, and the crime scene investigators arrived.

Hardin Edwards, a truck driver, testified that he arrived at his point of delivery on Knight Road in Memphis at 1:20 a.m. on September 17, 2007. He said that he was sitting in his truck doing paperwork when he saw a car "come out from where a truck was parked further down in the warehouse area," and he saw the same car return ten minutes later to park beside the rear tires of the truck on the driver's side. Mr. Edwards testified that he noticed the car because the rear window was broken and "had plastic wrapped around it." He said that when he went to bed at 1:50 a.m., the car was still parked in the same place. Mr. Edwards identified a picture of the car that he saw that day. When he awoke at 7:00 a.m., he saw a fire truck and police officers responding to the scene. After someone informed him that a truck driver had been killed, he told the police what he had seen earlier.

Theresa Rucker testified that in September 2007, she was working for Federal Express at 3835 Knight Road. She said that on September 17, 2007, she had to be at work at 2:15 a.m. Ms. Rucker testified that on that day, as she entered the parking lot, she noticed a turquoise car with the rear window broken because the car was driving fast and almost hit her. She said that she told police about the turquoise car later that day after seeing the police and the fire department around the victim's truck.

On cross-examination, Ms. Rucker testified that she saw a black male driving the car and a black person in the passenger seat, but she could not tell whether the passenger was male or female.

Memphis Police Officer Charles Cathey, a crime scene investigator, testified that he responded to the scene on September 17, 2007. He said that he observed a red tractor trailer with the driver's side window broken and saw glass on the truck's steps and small dent marks on the door, "like something had struck the truck." Officer Cathey testified that when he opened the door, he saw a red substance that appeared to be blood on the inside of the driver's door and broken glass on the driver's seat and the floor beside the seat. He also saw a substance that appeared to be blood on the outside of the driver's door and the steps of the truck. Officer Cathey found a human tooth on the floor of the truck. He said that there was a wire hanging down from the roof of the cab where a CB radio would typically be located. Officer Cathey testified that there was a large pool of blood between the front seats of the truck, and a small pool of blood and broken glass under the driver's seat. He located a second human tooth on the

driver's seat, underneath a seat cover. Officer Cathey said that the victim's body was lying on the floorboard of the cab.

On cross-examination, Officer Cathey testified that another officer processed the truck for fingerprints after they towed it to the impound lot. He said that the officer did not find any usable prints on the outside of the truck. He did not recall the officer processing the interior of the truck for fingerprints. Officer Cathey testified that he completed a form in which he reported that another officer processed a turquoise Saturn for fingerprints and found that the car was negative for prints.

Suleman Shamsuddin testified that in September 2007, he owned the BP service station at 4161 Winchester Road. He said that the video surveillance system was working on September 17 and that the store had an automated teller machine (ATM), but the ATM was out of currency. The [S]tate published the surveillance video from September 17, 2007, to the jury.

Sheila Dixon testified that in September 2007, she lived in the Wooddale Condominiums on Winchester Road. She said that on September 17, 2007, her boyfriend had wired her money, but she could not pick up the money transfer because she could not find her identification. When she saw the [petitioner], with whom she was friends, in the condominium complex, she asked him if he could get the money transfer for her with his identification. Ms. Dixon testified that while they were waiting for a ride to pick up the money gram, the [petitioner] told her that he had shot a truck driver by mistake. She said that he offered her the truck driver's credit cards, and she said that the [petitioner] also had a telephone, some papers, and a wallet with him. She testified that she did not take the credit cards, but that "[t]hey ended up in [her] purse." Ms. Dixon testified that the person who picked them up to take them to get the money gram told the [petitioner] that he wanted "that hot CB" that the [petitioner] had. She recalled seeing the CB in the car, and she said that she was familiar with CB radios because her boyfriend was a truck driver. Ms. Dixon testified that the police searched her apartment, and she gave them her purse, in which they found the credit cards. Ms. Dixon identified the Comdata credit cards that the [petitioner] offered to her and which the police found in her purse. Ms. Dixon recalled that the [petitioner] and his co-defendant gave her a ride sometime before September 17, and she testified that there was a sawed-off shotgun in between the seats and that they told her that "they [were] going to check on a trap." She said that

-4-

checking on a trap meant to her that they were trying to make some money. Ms. Dixon said that the co-defendant drove the car and the [petitioner] sat in the passenger's seat. She testified that she knew the [petitioner] as Big Daddy and the co-defendant as Unk.

On cross-examination, Ms. Dixon said that the police came to her apartment looking for the [petitioner]. She agreed that she told the police about the [petitioner's] alleged confession to her while incarcerated on a forty-eight-hour hold.

Scarlett Renee Banks testified that on September 17, 2007, from her back door, she saw the [petitioner] driving a burgundy truck and the co-defendant driving a turquoise car around the Wooddale Condominiums. She said that she went outside to where they had gotten out of their vehicles. Ms. Banks testified that the co-defendant handed her a gun and said, "'Huh go put this up.'" She took the gun inside of her home and put it behind her couch. Ms. Banks said that the gun was a short shotgun that had plastic and tape on it. She testified that she went back outside, and she saw the [petitioner] and co-defendant in an empty apartment. She said that they had "a lot of blood on them" and that they were washing money that had blood on it. Ms. Banks testified that she gave the police consent to search her apartment on September 20, 2007. She said that the gun was not in her apartment when they searched it, but the police came back later and found the gun somewhere else.

Marcus Nelson testified that the co-defendant was his uncle. He testified that he gave the co-defendant a sawed-off shotgun on a Saturday, which was the 15th of the month but he could not recall which month. Mr. Nelson said that he identified the gun for the police on September 20, 2007, and he agreed that he gave the co-defendant the gun on the Saturday before September 20.

Tennessee Bureau of Investigation Special Agent Cervinia Braswell, a forensic scientist in the firearms identification unit, testified that she examined the shotgun found by police in the course of their investigation in this case. She explained that the shotgun was a single shot, 12 gauge, model and that the barrel was sawed off. Agent Braswell said that Hopkins and Allen manufactured the shotgun between 1898 and 1917. She testified that the force necessary to pull the trigger was three pounds, but a person could also fire the weapon if he pulled the hammer back without cocking it all the way and then let the hammer fall forward. She said that if a person

-5-

hit the back of the gun with a mallet-type hammer with enough force, that the gun would fire. Agent Braswell clarified that if the hammer is fully cocked, the person must pull the trigger to fire the gun. Agent Braswell identified photographs, labeled as Exhibits 40 and 42, which she said depicted, respectively, pellets consistent with coming from a shotgun shell and cardboard shotgun shell wad. She testified that she could not identify pellets as coming from any particular shotgun. Agent Braswell said that for the medical examiner to find a shotgun shell wad in a victim during an autopsy, the muzzle of the shotgun "would have to [have been] fairly close" because the wads lose momentum as they travel.

Memphis Police Sergeant Anthony Mullins testified that he participated in the investigation in this case. He identified the shotgun found by police on September 20, 2007, on Boxdale Street. Sergeant Mullins said that the shotgun "was inside a plastic bag behind a board that was used to board up a vacant building." He stated that the co-defendant told the police that he gave the gun to Renee Banks. When the police did not find the gun in Ms. Banks's apartment, they took the co-defendant to the area and allowed him to speak with Ms. Banks, who eventually led them to the location of the gun.

Sergeant Mullins further testified that he interviewed the [petitioner] on September 24, 2007. He said that the police had been actively looking for the [petitioner] for five to six days. Sergeant Mullins testified that he and his partner, Sergeant Mason, advised the [petitioner] of his rights prior to the questioning, and the [petitioner] signed a waiver form. Sergeant Mullins said that the [petitioner] did not appear to be under the influence of any intoxicants. The [petitioner] told them that he went to Nashville, Tennessee, on Sunday, September 16, with a friend because his friend had an appointment for a urine test in connection with his probation. The [petitioner] stated that they stayed in a hotel that night, went to the 9:00 a.m. test on Monday morning, and immediately returned to Memphis. Sergeant Mullins said that he showed the [petitioner] pictures of several individuals with the same name as the [petitioner's] friend with whom he allegedly went to Nashville as well as the pictures of the co-defendant and potential witnesses. Of all the pictures, the [petitioner] said that he only recognized Sheila Dixon. Sergeant Mullins showed the [petitioner] a still photograph taken from the BP station located at Winchester Road and Lamar Avenue that showed a "teal, blue-green Saturn [with] a big piece of plastic on the back windshield with tape on it," and the [petitioner] stated that he recognized the vehicle. Sergeant Mullins could not recall whether

-6-

the [petitioner] said how he recognized the vehicle. He showed the [petitioner] a second still photograph from the interior of the BP station that showed the [petitioner] inside the store, and the [petitioner] read aloud the time stamp on the photograph, which was September 17, 2007 at 2:26 a.m. The [petitioner] admitted that he had not been in Nashville the evening of September 16 through September 17. He said that he met a man called Unk at the BP station, and they ran a scam with credit cards that Unk had. Sergeant Mullins said that they questioned him further about "that version of events" and then took a break from the interview. When they returned, the [petitioner] told them that he wanted to tell them the truth. The [petitioner] identified a photograph of the co-defendant as the man he called Unk. He said that the co-defendant approached him about making money. The [petitioner] drove the Saturn, with the co-defendant as the passenger, to a truck stop on Knight Road. They approached a truck, and he let the co-defendant out of the car and drove away. After hearing a loud noise that he thought sounded like a gunshot, the [petitioner] looked back at the truck and saw the co-defendant get into the truck, leave the truck, and return to the car. Sergeant Mullins testified that they told the [petitioner] that they had previously talked to the co-defendant, who had told them his version of the events, and that they felt that the [petitioner] "was still being less than truthful with [them]." They told him that "[h]e could proceed and tell [them] the full truth, or go with what [they] had, so far." Sergeant Mullins said that, at that point, the [petitioner] admitted to being the passenger in the car and to firing the shotgun. The [petitioner] told them that "[h]e was just going to try to scare [the victim] out of his money with the gun, but it went off as soon as he tried to cock it." Sergeant Mullins testified that, after the [petitioner] gave his oral statement, they advised him of his Miranda rights a second time and memorialized his statement in writing. In his written statement, the [petitioner] admitted to being responsible for the victim's death and stated that he accidently shot him while trying to rob him. The [petitioner] further stated that his co-defendant drove them to the victim's truck in a blue-green car with a busted back window, which the co-defendant had stolen. He said that he took a phone and a wallet from the victim. They left the area but then returned to the truck and took a CB radio. The [petitioner] said that he was wearing a black shirt and blue jeans when he shot the victim, and he changed into a white shirt and jogging pants at the Wooddale Condominiums, leaving the black shirt and blue jeans in a vacant apartment. The [petitioner] said that he "attempted to use [the victim's Visa credit card] at BP, but [he] didn't get a chance to use it." He said that the clothes he had on during the interview were the same

clothes he changed into that day, so Sergeant Mullins collected the clothes as evidence.

Dr. Lisa Funte, a forensic pathologist and an assistant medical examiner, testified that lacerations on the victim's body indicated that the shooter fired through an intermediate target, and she agreed that glass could have been the intermediate target. Dr. Funte said that because the pellets did not have an upward or downward trajectory, the shooter held the shotgun level with the ground, and because the victim was inside a truck, the shooter most likely had to stand on the steps of the truck. Dr. Funte testified that a shortened shotgun fired from close range caused the victim's injuries and that a shotgun wound to his neck and chest caused his death.

The [petitioner] offered into evidence Tennessee Bureau of Investigation reports showing that agents did not find blood on the [petitioner's] clothing.

The [S]tate called Sergeant Mullins in rebuttal, and the court qualified him as an expert in crime scene investigation. He opined that, based on his analysis of crime scene photographs, a person could have entered the victim's truck twice without getting blood on his clothes if he had moved the victim's body out of the driver's seat.

Id. at *3-7.

In addition, this court described the proof at the suppression hearing that took place before trial as follows:

Prior to trial, the [petitioner] presented two motions to suppress his statement. His first motion alleged that he was under the influence of marijuana when interviewed by police; therefore, his waiver of his Miranda rights was not voluntary, knowing, or intelligent. His second motion alleged that the court should exclude his statement because it arose due to an improper arrest. On August 21, October 2, and October 24, 2008, the court held suppression hearings, at which the parties presented the following evidence.

State's Proof. Memphis Police Officer Joe Stark testified that he was the case coordinator for the investigation into the victim's death. He explained that he developed the [petitioner] as a suspect based on the co-defendant's identification of the [petitioner], various witness statements,

-8-

and video surveillance tapes of the [petitioner] on the night of the victim's murder. Officer Stark testified that none of the witnesses were able to tell police where the [petitioner] lived.

On cross-examination, Officer Stark agreed that he secured neither a search warrant for any residence where the [petitioner] might have been nor an arrest warrant for the [petitioner].

Memphis Police Sergeant Anthony Mullins testified that he interviewed the [petitioner] after police took the [petitioner] into custody. Sergeant Mullins said that he had the [petitioner] read aloud the advice of rights form, and the [petitioner] did not have any difficulty reading the form. He stated that the [petitioner] was "kind of unkempt, but he was alert. He was basically cooperative during the entire process . . ., and he seemed to be pretty clear[-]headed, lucid." Sergeant Mullins testified that nothing in his interaction with the [petitioner] led him to believe that the [petitioner] was not in control of his faculties or intoxicated in any way.

On cross-examination, Sergeant Mullins testified that the [petitioner] had said that he had smoked marijuana "about two hours before he was even arrested . . . [w]hich was about three hours before [they] talked to him." Sergeant Mullins stated that it might have been up to five hours between when the [petitioner] smoked the marijuana and when he interviewed him. He testified that it took six and a half hours to begin typing the [petitioner]'s written statement because the [petitioner] told "elaborate" lies, they took breaks, and they took time to attempt to verify what the [petitioner] told them. Sergeant Mullins said that it was necessary to tell the [petitioner] parts of what the police already knew so that the [petitioner] would realize that the police were not merely guessing about his involvement.

Detective Jason Bartlett, of the Shelby County Sheriff's Office, testified that the Memphis Police Homicide Unit requested that the sheriff's office assist them in locating the [petitioner]. Detective Bartlett said that his research on the [petitioner] led him to a residence on Auburn Road. He and his team went to that address. Detective Bartlett testified that they

> knocked on the door, and . . . a young, adult, male black . . .
> answer[ed] the door. [They] identified [themselves] to the
> young adult. [They] were in gear that said Sheriff on it. And
> [they] showed the young male black a picture of [the

petitioner] and asked him if he knew him and the subject identified that he did know him. [They] asked if [the petitioner] was inside the residence and the young male black said . . . he was. And [they] asked him where he was and . . . he pointed towards the back of the residence on the inside. At that time, the young male black . . . stepped out of the way of the doorway allowing [them] access into the residence.

Detective Bartlett said that they found the [petitioner] lying on a bed and handcuffed him. He stated that they did not search the residence.

On cross-examination, Detective Bartlett said that the person who answered the door appeared to be at least eighteen years old. He agreed that he did not ask the person who he was, whether he had permission to grant access to the home, or to sign a consent to search form. Detective Bartlett testified that he did not encounter anyone else in the house and did not recall anyone asking him whether he had a warrant.

*Defense Proof.* Geraldine Maldrough testified that in September 2007, she lived on Auburn Road with her sister, Edna Elrod, and Ms. Elrod's two grandsons, Lindsey and Delvon. Ms. Maldrough recalled that on a Monday during the day, Delvon came to her room, which was in an attached mother-in-law suite, and told her that the police w[]ere there looking for the [petitioner]. She went to the front of the house and asked an officer whether they had a warrant. The officer replied that they did not need a warrant. Ms. Maldrough said that by that time, they were taking the [petitioner] out of the house. She said that she saw more than four officers. Ms. Maldrough testified that Delvon was fourteen years old at the time.

The defense called Detective Bartlett, who testified that he did not recall having a conversation with the [petitioner] about whether the [petitioner] was under the influence of any drugs. He stated that he had reviewed a videotape of when he walked the [petitioner] into the homicide office. Detective Bartlett testified that the tape recorded his making a statement that the [petitioner] had told the officers that they were ruining his high.

Edna Elrod testified that she was a friend of the [petitioner] and that they had dated from 1998 until 2001. She said that she lived on Auburn Road with her sister, her son, and her grandsons, Lindsey and Delvon. Ms. Elrod stated that Delvon was fourteen years old in September 2007. She

testified that the [petitioner] had been staying with her for approximately one week before his arrest.

> In its order denying the [petitioner's] motion to suppress his statement, the court found that the [petitioner's] arrest was illegal because (1) the [petitioner] was an invited guest, (2) the police did not have a warrant, (3) they did not have valid consent to enter, and (4) there were no exigent circumstances. Under the precedent of New York v. Harris, 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990), the court ruled that the exclusionary rule did not require that the [petitioner's] statement be suppressed because the police had probable cause for arresting the [petitioner] and they did not obtain his statement by exploiting the unlawful entry.

Id. at *1-3.

Relevant to this appeal, the petitioner challenged the trial court's suppression ruling on direct appeal, but this court upheld it. Id. at *7. This court first rejected the petitioner's argument that his Miranda waiver was not knowing and voluntary because he was intoxicated with marijuana at the time. Id. at *7-8. This court noted Sergeant Mullins' testimony that an estimated three to five hours had passed between when the petitioner smoked marijuana and when officers began the interview and that all of the law enforcement officers who testified agreed that the petitioner did not appear to be intoxicated. Id. at *8. This court also noted that the petitioner was capable of giving a narrative of past events and creating an elaborate false story prior to eventually detailing how he shot the victim while robbing him. Id. This court further noted that the petitioner presented no evidence suggesting that he was so influenced by drugs that his "confession cannot be considered the product of a free mind and rational intellect." Id. (citation omitted). This court accordingly found that the petitioner was not entitled to relief with regard to the knowing and voluntary nature of his confession. Id.

With regard to the petitioner's assertion that his statement should have been excluded because it arose during an improper arrest, this court, in reliance upon New York v. Harris, 495 U.S. 14 (1990), declined to exclude the statement. Id. at *7, *9-10. This court noted that, under Harris, the exclusionary rule did not bar the use of a statement if it was taken after an unlawful arrest that was nonetheless supported by probable cause. Id. at *10 (citing State v. Jenkins, 81 S.W.3d 252, 264 (Tenn. Crim. App. 2002)). Turning to the present case, this court observed that "[t]he police had information from the co-defendant and other witnesses regarding the [petitioner's] involvement, and they took the [petitioner's] statement at the police station after ensuring that the [petitioner] understood his Miranda rights." Id. This court concluded that "the

-11-

police had probable cause to arrest the [petitioner] in his residence and that the exclusionary rule does not require the suppression of his subsequent statement taken outside of the residence." Id.

On March 14, 2012, the petitioner filed a pro se petition for post-conviction relief. Thereafter, various amended and supplemental petitions were filed through appointed post-conviction counsel as well as pro se. In his petitions, the petitioner raised a number of allegations, including three of the issues pursued in this appeal: that trial counsel was ineffective for (1) failing to argue that the petitioner's arrest was not supported by probable cause; (2) failing to argue that the petitioner's judicial determination of probable cause was unreasonably delayed; and (3) not attempting to obtain the unedited footage from "The First 48" television show.

The post-conviction court conducted an evidentiary hearing, at which the petitioner testified that he "[v]aguely" remembered the events of the night he was arrested. He recalled that he was asleep at his girlfriend's house and woke "up with guns in [his] face." He admitted that, prior to falling asleep, he was "[g]etting high" on "[w]eed, cocaine, rock cocaine." Specifically, he "had been smoking rock cocaine all night and . . . had smoked about five blunts." The petitioner said that when he took drugs, he became "spaced out," and his mind felt "clouded." He also said that, when under the influence of drugs, he was capable of telling an elaborate lie "if [he] was trying to get out of something." The petitioner estimated that on the night he was arrested, he was "[o]ver the scale" on a scale of one to ten with ten being the "highest" he could be.

The petitioner testified that he could not recall how long it took for him to get to the police station because he was high and drowsy, having only been asleep for approximately thirty minutes when he was awakened by police. He could not recall whether anyone advised him of his Miranda rights. He said that the officers placed him in an interrogation room, and he "put [his] head down and went to sleep." He could not remember how long the interrogation lasted but noted that the "paper" showed it lasted seven and a half hours. He claimed he was "in and out" of consciousness during the interview. With regard to the effect of the drugs wearing off, the petitioner said, "[Y]ou're high till you get at least a[n] eight-hour sleep in order to get back functioning."

The petitioner admitted that he told the officers a false story that he was in Nashville with a friend on the night in question before ultimately confessing to the murder. Asked why he changed his story, the petitioner explained, "When you been arising really to try to get away from people and scared, it's no telling what you will do when you're high or sober." He elaborated, "I couldn't tell you why it changed. It just changed because I believe because I was scared." He claimed that he was threatened "a lot of times." In particular, the officers told him that they were "going to lock [him] up

-12-

for the rest of [his] life if [he] d[id]n't tell the truth." At one point, an officer told him that he was free to go, but he was unable to do so because his ankle was cuffed to a chair.

The petitioner admitted that the officers confronted him with images of himself at a gas station and told him that they had spoken with his co-defendant. He said that the officers told him that he would be set free if he told them "what they showed [him] on a paper that suppose [sic] to be [his] charge partner wrote down." He clarified that the officers wanted him to write down verbatim the contents of his co-defendant's statement. The petitioner said that he complied because he was in and out of consciousness and wanted to get some more rest and drugs. However, even though he claimed to be in and out of consciousness, the petitioner recalled the interrogation, answering the officers' questions, and being able to write his statement. The petitioner recalled that his case was featured on "The First 48" television show, but he did not remember seeing the camera until after the interrogation ended and he was booked. However, he remembered the officers' talking about it. The petitioner claimed that he was arrested on September 24, 2007, but was not taken before a judge until September 27, 2007.

The petitioner testified that he attempted to seek interlocutory review of the trial court's ruling on the motion to suppress. According to the petitioner, he and trial counsel did not discuss the suppression hearing beforehand, so he did not know what to expect. He asked trial counsel to appeal the trial court's suppression ruling, but trial counsel advised him to address it on direct appeal. The petitioner stated that he was satisfied with the witnesses trial counsel presented at the suppression hearing, but he was dissatisfied that counsel failed to ask those witnesses certain questions. During counsel's representation of him, the petitioner provided counsel with legal authority and various motions, but counsel told the petitioner that the motions were frivolous. The petitioner said that he wanted trial counsel to look at the door to his girlfriend's house where he was arrested, so counsel could see that the door was broken and that it would have been easy for the police to "pry it open and just go in."

The post-conviction court sought clarification as to what the petitioner was challenging regarding trial counsel's performance during the suppression hearing considering that the trial court ruled that the petitioner's arrest was illegal, but, because the police had probable cause to arrest him, his confession was not fruit of the illegal arrest. The petitioner said that trial counsel "argued . . . [the petitioner's] statement but [counsel] didn't argue that they came and arrest[ed] [the petitioner] illegally, [counsel] just argued the statement." Post-conviction counsel then clarified that trial counsel failed to dispute that the police had probable cause to arrest the petitioner. The post-conviction court disagreed, noting that the State presented evidence supporting a finding of probable cause at the suppression hearing.

The petitioner testified, with respect to the trial, that he felt trial counsel should have hired a blood splatter expert. He also mentioned that it was trial counsel's decision that the petitioner not testify because "[counsel] felt that he would win without [the petitioner] testifying." The petitioner was dissatisfied that trial counsel did not have a surrebuttal prepared. He said that his girlfriend, his girlfriend's son, and the boy who answered the door to his girlfriend's home the night he was arrested could have been his alibi witnesses. He claimed he provided those names to trial counsel, but "[counsel] didn't do nothing." He also claimed that he never gave a statement of admission to Sheila Dixon. After further inquiry by the post-conviction court, the petitioner reiterated his dissatisfaction with trial counsel's not calling a blood splatter expert in rebuttal, not calling his co-defendant to testify, not impeaching Sheila Dixon, and not obtaining "The First 48" video footage. He also said that trial counsel "should [have] brought in proof showing that the evidence within the whole entire case was not substantial to prove the statement." He further said that the State should have had the footage from "The First 48" that was filmed during his interrogation.

Sergeant[1] Anthony Mullins testified that in 2007, he worked as a detective for the Memphis Police Department's Homicide Bureau. Sergeant Mullins was not the arresting officer, but he interviewed the petitioner and co-defendant. Asked about his typical practice regarding arresting or interrogating suspects, Sergeant Mullins said that he may ask a suspect to voluntarily come in for an interview even though he had probable cause to arrest him or her. He elaborated that he preferred to interview a suspect to ensure that formal charges were appropriate because he had arrested people in the past for crimes they did not commit "because they weren't vetted enough." Although he could not recall, Sergeant Mullins assumed that the arresting officers had probable cause to arrest the petitioner if they brought him to the police department in order to be interviewed.

Sergeant Mullins testified that he did not typically issue a warrant based solely on a co-defendant's statement, but a co-defendant's identification of someone as being involved "would be enough for [him] to want to talk to whoever they name." He could not remember whether anyone other than the co-defendant had implicated the petitioner in the crime, but he did recall that the police had recovered property and seen surveillance footage linking the petitioner to the crime.

Sergeant Mullins could not recall how long his interview of the petitioner lasted, nor did he recall the petitioner's asking to leave at any point. He said that the petitioner did not appear to be intoxicated during the interview but, rather, was lucid, alert, and

---

[1] At the time of the post-conviction hearing, Sergeant Mullins had been promoted to the rank of Lieutenant. However, we will refer to him by the rank of Sergeant to be consistent with the evidence and testimony presented in the petitioner's trial.

gave appropriate responses to questions. Sergeant Mullins said he had been in an interview room with an intoxicated person, and, in that situation, he did not interview that person. Contrary to the petitioner's assertion, Sergeant Mullins said that the petitioner was not in and out of consciousness or falling asleep during the interview. He stated that if a person were falling in and out of consciousness, he might have called an ambulance for that person but certainly would not have continued the interview.

Upon questioning by the post-conviction court, Sergeant Mullins briefly referenced the "forty-eight-hour hold" procedure utilized by the police department during that time period:

> At . . . the time we're talking about, we used the forty-eight-hour hold. Where if we had the probable cause we'd put them on a hold and that might be the reason for the hold, in essence, is we had significant information but this person is so intoxicated or I've had people that needed medication, so we stopped the interview. I've had people that . . . could barely sit up when they were brought into our office, so . . . if it were applicable we'd put them in the jail.

Upon further questioning by post-conviction counsel, Sergeant Mullins elaborated that the forty-eight-hour hold was not only used when a suspect was intoxicated. Sergeant Mullins explained how it was sometimes used before a suspect was charged:

> If, for example, I may have enough to . . . charge this person with a crime, and in this case a murder, and maybe it's just a quirk on my part but I don't -- it's too serious for me to say, hey, I got just enough to charge him, so let's just charge him and be done with it. We would use the forty-eight-hour hold, we would have people that were in the hospital, we can't talk to them. Maybe they didn't do it but we can't ask them because they're knocked out under the influence of narcotics. We've had people that we would get them in at our office late in the evening and we may begin the interview and they say, look, I'm tired. We've got enough that . . . we just can't in good conscious just let them go. And we had that tool available, so we used it. Quite frankly, we used the forty-eight-hour hold.

Sergeant Mullins also recalled "The First 48" television show that was filmed in Memphis during that time period. His understanding from the producers of the show was that all the footage was shipped to New York and that any footage the producers decided not to use was destroyed. He was aware of other lawyers and courts attempting to get footage from the producers, but he was not aware of any being successful. Sergeant Mullins agreed that the entire six-hour interview of the petitioner was not aired on the

television show, meaning "[t]he other five and a half hours w[ere] cut on the editing floor."

Detective Joe Stark testified that he worked as a detective for the Memphis Police Department's Homicide Bureau in 2007 and was the case coordinator in the petitioner's case, meaning he managed the investigation and determined whether to issue an arrest or search warrant. Detective Stark stated that the homicide bureau typically did not seek an arrest warrant for a suspect in a homicide case but, instead, attempted to interview the individual before formally charging him or her in order to make sure the person did not have a "plausible explanation" for the evidence against him or her.

Detective Stark testified that officers discovered the body of the victim in his truck on September 17, 2007. They then spoke to witnesses who had seen a green Saturn with a broken, taped-up back window parked next to the victim's truck. One of the witnesses was very specific about the make and model of the car because his wife owned a similar one. Another witness, Theresa Rucker, saw the Saturn in the immediate vicinity of the crime scene and noted that it was driven by an African-American man with a passenger who was also African-American, although she was not positive of the passenger's gender. The officers subsequently found a surveillance video that showed the Saturn pull into a nearby convenience store parking lot and then, seconds later, showed the petitioner trying to use an ATM inside the store.

Officers arrested the co-defendant, Calvin Nelson, who was seen driving a Saturn matching the description, and recovered the murder weapon from information received from Mr. Nelson. Mr. Nelson told the officers that the petitioner "was the one that pulled the trigger." Officers also questioned Sheila Dixon who was found with the victim's credit cards in her possession. Ms. Dixon said that she received the credit cards from the petitioner, but she was not able to testify whether the petitioner was at the scene of the murder. Detective Stark described Mr. Nelson and Ms. Dixon as co-defendants and could only recall one other person implicating the petitioner, although "it was going to be like a hearsay type thing." He admitted that he did not issue a warrant for the petitioner's arrest prior to having him brought in for questioning, but Detective Stark believed he "had enough to charge him for the first degree murder."

Detective Stark explained when a "forty-eight-hour hold" was used: "[B]asically when it would get late at night or we feel like there was something else to do. But before you put somebody on a forty-eight-hour hold we always had enough to charge them with a charge." He recalled that the petitioner gave a confession during the forty-eight-hour hold. Detective Stark recalled that the petitioner was arrested without a warrant on September 24, 2007, at 3:30 p.m., and he sought a judicial determination of probable cause on September 26, 2007, at 1:05 p.m. Detective Stark believed that even if the

petitioner had not given a confession, there was still enough evidence to charge him with murder.

Trial counsel testified that the petitioner was "easy to get along with and wasn't very demanding of the things he thought [counsel] should be doing." He recalled that the petitioner would ask him "what [they] were going to do and [counsel] would tell him what [counsel's] plan was and he and [counsel] were on the same page, . . . pretty early on." He did not remember having any disagreements with the petitioner or "not doing things [the petitioner] wanted [him] to do." Trial counsel said that his usual practice was to file a boilerplate motion to suppress and then a more specific memorandum in support or an amended motion after he had an opportunity to review the evidence. However, he recalled that as the suppression hearing proceeded, he realized that he needed to call other witnesses and had the hearing bifurcated twice to allow for further testimony.

Trial counsel acknowledged that he never requested the unedited footage of "The First 48" television show that featured the petitioner's case. However, he elaborated that the reason he did not do so was because, in another case he had handled, he contacted the producer about getting such footage and was informed that any footage not aired on the show was destroyed. He made this phone call within months of his representation of the petitioner and did not "duplicate" it just to be told again that the producers no longer had the uncut footage. Moreover, although there was one three-second portion of the final video that was helpful, it also captured the petitioner's confessing to shooting the victim and corroborated part of the State's case.

Trial counsel testified that the petitioner did not have any interest in testifying. The petitioner never asked him to hire a blood splatter expert, nor did trial counsel know what retaining such an expert "would have accomplished in [the petitioner's] favor at his trial." The petitioner never suggested that he was not at the crime scene or gave trial counsel the names of any witnesses to look for.

Trial counsel testified that he did not argue at the suppression hearing that the police lacked probable cause to arrest the petitioner because he did not think it was a fight he would win in light of the State's evidence. He tried not to raise frivolous or fruitless arguments with the court because doing so could damage his credibility. Regarding the length of the petitioner's detention, trial counsel noted that the petitioner confessed six hours after being brought into custody and that Sergeant Mullins provided a reasonable explanation for why it took that long. Trial counsel described the petitioner as a "silent partner" at the suppression hearing, making no requests of trial counsel to do additional work.

Following the conclusion of the hearing, the post-conviction court denied the petition. With regard to "The First 48" television show, the court noted that trial counsel and attorneys in other cases had made efforts to obtain video footage from the show but that once the show's producers edited the program, any unused footage was destroyed. The court also noted that some aspects of the show were staged and not always shown in sequential order. The court determined that the video would have been inadmissible due to the alteration and editing. The court, therefore, found that the petitioner did not establish ineffective assistance of counsel on this ground.

Regarding the petitioner's motion to suppress, the post-conviction court noted that trial counsel had successfully litigated the legality of the petitioner's arrest at the suppression hearing but that the trial court and this court had found that the arrest was supported by probable cause and that the petitioner's statement was therefore admissible. The post-conviction court found again that the petitioner's arrest was supported by probable cause due to the statements of Mr. Nelson and Ms. Dixon, corroboration from witnesses who saw the car in the vicinity, and the petitioner's being seen in the immediate vicinity. The court further found no ineffectiveness in trial counsel's failure to argue that there was no probable cause because trial counsel, "an experienced long-seasoned veteran criminal trial lawyer who's tried many homicide charges," felt there was no basis for such an argument. The court also rejected the petitioner's forty-eight-hour hold argument, finding that the petitioner was not unduly delayed and was brought before a magistrate within forty-eight hours of his arrest. The court determined that the petitioner was not under the influence or unable to give a knowing and voluntary statement. The court ultimately found that trial counsel was not ineffective and provided "very proper representation" that was "very effective in the manner in which he defended [the petitioner]."

## ANALYSIS

In this appeal, the petitioner alleges that trial counsel was ineffective for (1) failing to argue that the petitioner's arrest was not supported by probable cause; (2) failing to argue that the police unreasonably delayed in seeking a judicial determination of probable cause; and (3) not attempting to obtain the unedited footage from "The First 48" television show. The petitioner also sets forth the additional argument that his due process rights were violated by the State's failing to preserve unedited footage from "The First 48" television show.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v.

-18-

State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

## I. Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he or she would not have pled guilty but would instead have insisted on proceeding to trial.

-19-

Hill v. Lockhart, 474 U.S. 52, 59 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001).

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

## A. Arrest Supported by Probable Cause

The petitioner first argues that trial counsel was ineffective because he failed to argue in the motion to suppress that the petitioner's arrest was not supported by probable cause.

"Probable cause . . . exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" State v. Echols, 382 S.W.3d 266, 277-78 (Tenn. 2012) (quoting State v. Bridges, 963 S.W.2d 487, 491 (Tenn. 1997)).

At the post-conviction evidentiary hearing, trial counsel testified that he did not argue at the suppression hearing that the police lacked probable cause to arrest the petitioner because he did not think it was a fight he would win in light of the State's evidence and that he tried not to raise frivolous or fruitless arguments because doing so could damage his credibility. In its order denying the petition, the post-conviction court found that trial counsel was not ineffective for failing to argue that the petitioner's arrest was not supported by probable cause because trial counsel, "an experienced long-seasoned veteran criminal trial lawyer who's tried many homicide charges," felt there was no basis for such an argument. The post-conviction court found that the petitioner's arrest was indeed supported by probable cause and noted that this court also determined such on direct appeal.

Upon review, we conclude that the record supports the post-conviction court's determination. At the time of the petitioner's unlawful arrest, the police had information that witnesses saw a turquoise Saturn with a broken and taped-up rear window parked next to the victim's truck in which his body was found. One witness told the police that a Saturn matching that description sped by her around 2:00 a.m. the day of the murder. The witness recalled that the driver was an African-American male and the passenger was also African-American, although she was not sure whether the passenger was male or female. Officers obtained surveillance video from a nearby convenience store that

showed the Saturn pulling into the parking lot and, seconds later, the petitioner attempting to use an ATM inside. The officers identified the co-defendant as being involved in the offense, and the co-defendant provided a statement implicating the petitioner in the crime and providing information that led to the murder weapon. The officers questioned Sheila Dixon, who was found with the victim's credit cards in her possession and said she received the cards from the petitioner. All of this information was known by Detective Stark when he directed the arresting officer to locate and arrest the petitioner. As this court determined previously on direct appeal, these facts were sufficient to warrant a prudent person in believing that the petitioner was involved in the murder. Therefore, trial counsel was not deficient for failing to argue that the petitioner's arrest was not supported by probable cause.

Even if the petitioner's arrest was not supported by probable cause, his subsequent statement to police may still be admissible if it is not "fruit of the poisonous tree." See State v. Johnson, 980 S.W.2d 414, 423 (Tenn. Crim. App. 1998). "[T]he primary inquiry is 'whether [the statement] was sufficiently an act of free will to purge the primary taint of the unlawful invasion.'" Id. (quoting Brown v. Illinois, 422 U.S. 590, 599 (1975)). In making this determination, courts are to consider: (1) the presence or absence of Miranda warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and finally, of particular significance, (4) the purpose and flagrancy of the official misconduct. Id. (quoting State v. Huddleston, 924 S.W.2d 666, 674 (Tenn. 1996)).

In this case, first, the petitioner was provided multiple Miranda warnings. This court has previously rejected the petitioner's argument that he was intoxicated, and the testimony at the post-conviction hearing likewise indicates that he was not intoxicated. Second, there was a relatively short time period between the petitioner's arrest and the giving of his statement. Third, before giving his statement to the police, the petitioner first gave an elaborate, false story to the officers that was arguably an intervening circumstance demonstrating that the petitioner's later decision to confess was an act of free will. Lastly, the testimony at the post-conviction hearing indicates that the officers believed they had probable cause to arrest the petitioner and only sought to interview him before obtaining an arrest warrant to ensure that the charges were appropriate.

### B. Unreasonable Delay

The petitioner next argues that trial counsel was ineffective because he failed to argue in the motion to suppress that the judicial determination of probable cause was unreasonably delayed.

A judicial determination of probable cause that occurs within forty-eight hours of a defendant's arrest is generally sufficient to satisfy the Fourth Amendment, unless there is evidence that the probable cause determination was unreasonably delayed for the purpose of gathering additional information to justify an arrest, was motivated by ill will toward the defendant, or constituted a "'delay for delay's sake.'" Huddleston, 924 S.W.2d at 672 (quoting County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991)). "[I]f the statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." Id. at 675.

In ruling on this issue, the post-conviction court found that "there was [no] issue that [trial counsel] could [have] raised" because the petitioner was brought before a magistrate within forty-eight hours and there was "enough probable cause at that point to hold him and charge him." Upon our review, we likewise discern no ineffectiveness on trial counsel's part. The evidence shows that the petitioner was arrested at 3:30 p.m. on September 24, 2007. He was read his Miranda rights at 5:24 p.m., began giving his typewritten statement at 11:50 p.m., and finished his typewritten statement at 12:42 a.m. the following day. The magistrate made a probable cause determination on September 26, 2007, at 1:05 p.m., within forty-eight hours of the petitioner's arrest.

The petitioner has failed to show that this presumptively reasonable delay was done for an impermissible reason. When the petitioner was brought to the police department, the officers had sufficient probable cause to support his arrest. Although Sergeant Mullins interviewed the petitioner to ensure that it was appropriate to charge him and that the petitioner did not have a "plausible explanation" for the evidence against him, he did not seek to gather additional information to justify the *arrest*. Trial counsel was not ineffective for failing to assert a meritless argument.

Moreover, even if the delay was unlawful, the confession was not "fruit of the poisonous tree" requiring suppression of the statement. See Huddleston, 924 S.W.2d at 674. In making this determination, we consider: (1) the presence or absence of Miranda warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and finally, of particular significance, (4) the purpose and flagrancy of the official misconduct. See id. at 674-75 (considering these factors in the context of a Gerstein[2] violation). Here, the petitioner was provided multiple Miranda warnings, his statement was provided well within the forty-eight-hour time period, his first giving a false story to the officers was arguably an intervening circumstance dissipating the taint of any illegal detention, and the delay was not for some flagrant reason but to provide the petitioner an opportunity to explain the evidence against him.

---

[2] In Gerstein v. Pugh, 420 U.S. 103, 125, the United States Supreme Court determined that the Fourth Amendment mandates a prompt judicial determination of probable cause as a prerequisite to any extended restraint of liberty after a warrantless arrest.

-22-

## C. Television Footage

The petitioner next argues that trial counsel was ineffective because he did not attempt to obtain the unedited footage of his arrest and the investigation from "The First 48" television show.

At the post-conviction hearing, trial counsel acknowledged that he did not request the unedited footage of "The First 48" television show that featured the petitioner's case. However, he elaborated that the reason he did not do so was because, in another recent case he had handled, he contacted the producer about getting such footage and was informed that any footage not aired on the show was destroyed. He made this phone call within months of his representation of the petitioner and did not "duplicate" it just to be told again that the producers no longer had the uncut footage. Sergeant Mullins testified at the post-conviction hearing that his understanding from the producers of the "The First 48" television show was that all the footage was shipped to New York and any footage that the producers decided not to use was destroyed. He was aware of other lawyers and courts attempting to get footage from the producers, but he was not aware of any being successful. The petitioner has failed to prove that trial counsel was deficient for failing to needlessly duplicate a phone call.

Moreover, the petitioner has failed to establish prejudice. In order to succeed on a claim that counsel did not properly investigate or call favorable witnesses at trial, a petitioner must generally elicit favorable testimony from those witnesses at the evidentiary hearing, as a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This court has recently emphasized that the requirements in Black are true for witnesses who should have been called and for any evidence the petitioner claims should have been discovered and presented. See Randall K. Madison v. State, No. M2014-01942-CCA-R3-PC, 2015 WL 9488951, at *15 (Tenn. Crim. App. Dec. 29, 2015). "Failure to do so requires that the claim be denied since the court may not speculate as to the contents of the missing evidence." Id. Therefore, even if trial counsel should have duplicated the phone call to the show's producers, the petitioner has not established prejudice because he did not present the raw footage at the post-conviction hearing. The petitioner "ask[s] that this Court make an exception" to this general rule because of the "strong likelihood that the unedited footage would have been beneficial to his case." However, the petitioner supports this assertion with nothing other than speculation, and "strong likelihood" is not the relevant standard but instead the petitioner must establish his factual allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f).

-23-

## II. Due Process

The petitioner lastly argues that his due process rights were violated under <u>State v. Ferguson</u>, 2 S.W3d 912 (Tenn. 1999), by the State's failing to preserve unedited footage from "The First 48" television show. He asserts that the State should have confiscated the footage before the producers left the city. The petitioner, however, failed to raise this issue in the trial court, in his motion for new trial, on direct appeal, or in his post-conviction petition. The petitioner asserts in a footnote that he raised a <u>Brady</u>[3] issue and that it should be considered a <u>Ferguson</u> issue because the case involves lost or destroyed evidence. However, the petitioner provided no authority for this proposition. Moreover, the petitioner raised his prosecutorial misconduct claim citing <u>Brady</u> in a pro se amended petition filed after the post-conviction court had appointed counsel. We note that a person who is represented by counsel may not simultaneously proceed pro se. <u>See</u> <u>State v. Burkhart</u>, 541 S.W.2d 365, 371 (Tenn. 1976); <u>State v. Lyons</u>, 29 S.W.3d 48, 51 n.2 (Tenn. Crim. App. 1999). The petitioner also maintains that he should be able to raise this issue "for the first time in the post-conviction court." However, he cites no authority for this proposition either. The petitioner has waived this issue for numerous reasons and may not pursue it now before this court.

In addition, the petitioner acknowledges that this court has held that the "[S]tate is not obliged to furnish the appellant with information, evidence, or material which is available or accessible to him or which he could obtain by exercising reasonable diligence." <u>State v. Dickerson</u>, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993). Further, citing to a number of cases, the petitioner acknowledges that Tennessee courts have repeatedly stated that the State is not required to turn over material that was not in the possession or control of the State when it was lost. <u>See, e.g.</u>, <u>State v. Hutchison</u>, 898 S.W.2d 161, 168 (Tenn. 1994); <u>State v. Middlebrooks</u>, 840 S.W.2d 317, 333 (Tenn. 1992); <u>State v. Carter</u>, 682 S.W.2d 224, 226 (Tenn. Crim. App. 1994); <u>State v. Fox</u>, 701 S.W.2d 233, 236 (Tenn. Crim. App. 1985); <u>State v. Ladarron S. Gaines</u>, No. M2013-02272-CCA-R3-CD, 2014 WL 4179123, at *8 (Tenn. Crim. App. Aug. 22, 2014); <u>State v. Yevette Somerville</u>, No. W2001-00902-CCA-R3-CD, 2002 WL 1482730, at *4-5 (Tenn. Crim. App. Feb. 11, 2002).[4] However, the petitioner urges this court to determine

---

[3] <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

[4] The only contrary authority the petitioner cites is <u>State v. Sheri Lynn Cox, Alias</u>, No. E2005-00240-CCA-R3-CD, 2005 WL 3369257, at *3 (Tenn. Crim. App. Dec. 12, 2005), in which this court considered a <u>Ferguson</u> claim regarding receipt books, although there was no evidence the receipt books were in police custody. However, in that case, the receipt books were exchanged in the presence of a police officer in order to confirm a shortage of money for which the defendant was later prosecuted. <u>Id.</u> at *1. Thus, the police allowed the victim organization to retain the receipt books in order to determine the amount of the loss at issue but never collected them.

that the State had a duty to collect the unedited footage from the private actor "The First 48" television show because the private actor was filming a "state activity," yet he provides no authority for this distinction. The footage was never in the State's possession, and the State had no duty to confiscate it. Even if this issue is not waived, the petitioner is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE